UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 24-313 (PAM/DJF)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | DEFENDANT'S POSITION ON |
| | ) | SENTENCING FACTORS |
| JASPER WILLIAM JOHNSON | ) | |
| | ) | |
| Defendants. | ) | |

Jasper Johnson is many things. He is a twenty-one-year-old man with no criminal convictions. He is a troubled young man, with a long history of mental health struggles and diagnoses of autism-spectrum disorder, anxiety disorder, depression, and ADHD. He is a successful rap musician with a lucrative recording contract. He is a product of a broken home and a victim of childhood sexual abuse. And, now, he stands before the Court as a convicted felon.

Jasper's offense conduct involved fraudulently procuring promethazine with codeine, a cough syrup which, when mixed with soda or juice, is a popular recreational drug glamorized in the lyrics of rap music. As Jasper was trying to break into that music world as a white teenager, and desperate for acceptance by his more established peers, he discovered that promethazine with codeine gave him instant cachet and access.

This offense, which started when Jasper was a minor, reflects his immaturity and lifelong struggle to feel accepted in social situations. Jasper has never served a day in prison, yet he now faces a mandatory two-year consecutive sentence for

aggravated identity theft under Count 16.  Accordingly, the defense asks the Court to impose a sentence of time served on Counts 1 and 15 concurrent with each other and consecutive to the two-year sentence required under Count 16.

FACTS

1.    Childhood

Jasper grew up in North Minneapolis. His mother, Nicole, was only 20 when she married, and Jasper was born soon after. The marriage did not last. His parents divorced when he was three. PSR ¶ 64. Following the divorce, Jasper lived primarily with his mother. They struggled financially because his father did not pay child support consistently. Ex. A[1] at 2. Jasper described his financial situation growing up as "dirt poor." Ex. A at 4. For two years, Jasper and his mother lived with his grandparents. *Id.*; PSR ¶ 65. As Jasper's grandmother writes to the Court, "Jasper raised and supported Nicole almost as much as she did Jasper.  She clung to Jasper as much as he to her."

Although initially, Jasper split his time between his parents, when he was 10, he began to live with his mother full time, after witnessing his father viewing pornography and engaging in sexual behavior with his girlfriend. Ex. A at 2-3. Jasper also experienced extreme separation anxiety when he was apart from his mother.

Jasper had trouble fitting in at school, and he changed schools frequently. Ex.

---

[1] Filed under seal together with this memorandum is the psychological evaluation of Jasper by Leah Osborn, a clinical psychologist. Dr. Osborn's CV is attached as Exhibit B.

A at 3. He tried so hard to fit in that he became a target of bullying and manipulation by other children. *Id.* He could not understand social cues and when other students were joking or being sarcastic, Jasper believed they were being mean or bullying him. He would not say "no" to problematic behavior "to ensure that others liked him" and "wanting to be part of a group, not wanting to be left out." *Id.* at 7, 9. As his mental health records reflect, "he needed to be part of a group, be 'cool,' and not let his friends down." *Id.* at 10. He had poor social skills, low self-esteem, and a tendency to put himself into "compromising situations to fit in." *Id.* He had difficulty understanding and maintaining relationships, being fixated on others liking him. *Id.* at 23.

These tendencies made Jasper an easy mark for victimization. On two separate occasions, Jasper was sexually abused by classmates. The second of these was perpetrated by Jasper's best friend when Jasper was 13. Although Jasper repeatedly said no, he went along with his friend because he "felt he needed to please him." Ex. A at 3. The perpetrator, who was a year older, was prosecuted and adjudicated delinquent as a result. PSR ¶ 67; Ex. A at 3. Even then, Jasper worried that the boy would no longer be his friend.

When Jasper was 8, his mother remarried. PSR ¶ 66. Jasper has two half-sisters as a result. The older was born when Jasper was 10. Jasper struggled to give up being an only child and having his mother entirely to himself. He resented having to compete for his mother's attention. In addition, he and his stepfather had a fractious relationship. Jasper struggled with his parents' differing parenting

3

styles. His mother was loose with the rules, while his stepfather was a disciplinarian who demanded respect and believed in tough love. Ex. A at 3-4. Jasper moved out of the parental home when he was 18.

Jasper found it difficult to fit in with a peer group. He had trouble reading social cues and lacked social skills. Ex. A at 23. He became obsessed with skateboarding and spent all of his time at the skate park with older teens. They introduced him to drugs and pornography and bullied him. *Id.* at 22. *Id.* By age 13, he was smoking marijuana on a daily basis in order to be accepted by the older teens who he hung out with at the skate park. *Id.* at 23. As Dr. Osborn reports, "as a young child, he began demonstrating an intense desire to please others with a limited ability to discern how to do so without compromising himself." *Id.* at 22. He "overly focused on trying to please others with little social understanding." *Id.* at 23.

2.  Music Career

Jasper began making music when he was 10. PSR ¶ 68. By age 14, he was uploading his music to various apps, which began to generate a modest income. For high school, he attended the High School for the Recording Arts in St. Paul, which allowed him to continue developing his talent. As a teenager, Jasper had already signed with a manager and had a lucrative recording deal with a reputable studio. PSR ¶ 69. After completing that contract, Jasper entered into a new contract in 2025.

Harrison Jenkins is one of Jasper's managers. He writes to the Court that "Jasper is an exceptionally talented musician and a recognized pioneer of the

'Pluggnb' sound." His music has been streamed over 80 million times, a remarkable achievement. Mr. Jenkins writes that "I have rarely encountered someone with such a distinctive and uplifting effect on a global fanbase."

Similarly, Nissim Hershkovits, a second manager, describes Jasper as "an exceptionally gifted artist" with "a devoted following across the world."

3.      Mental Health Struggles

From the earliest age, his family could see that Jasper struggled with a host of issues.  He was very rigid and could not cope with changes in his schedule. He became obsessed to the point of fixation with a single interest at a time—whether it was cup stacking, Michael Jackson, skateboarding, or eventually rap music. Ex. A at 23, 24. He insisted on perfection in whatever he pursued, which only increased his anxiety if he could not live up to his own impossible standards. Any imperfection could cause a meltdown. He had temper tantrums that could last hours. When he became frustrated, he would hit himself in the head. Ex. A at 9. He was hypersensitive to touch to the point that he could not wear certain clothes or shoes because the seams did not feel right. Ex A at 7, 9. As a child, a fuzz ball on the inside of his sock could "ruin my whole day." *Id.* at 24. He needed to do certain actions a certain number of times, and he could not go to bed unless his glasses were positioned in the correct way. *Id.* at 11.

Jasper was picky about food, and the different foods on his plate were not allowed to touch. *Id.* at 23. He used a different utensil for each food. When he became frustrated, he would explode or make statements that life was too hard and

he did not want to live. *Id.* at 9. Fortunately, Jasper never acted on those sentiments.

Jasper first saw a psychiatrist when he was 10 years old. He was diagnosed with anxiety disorder and a generalized mood disorder due to his behavioral outbursts and increasing anxiety. *Id.* at 6. He was prescribed Prozac.

In the years that followed, Jasper saw a number of different therapists and received a number of different diagnoses, including adjustment disorder, *id.* at 7; autism spectrum disorder, *id.* at 8; generalized anxiety disorder, *id.* at 9; attention deficit/hyperactivity disorder, *id.* at 9; Unspecified Disruptive, Impulse Control, and Conduct Disorder, *id.*; Unspecified Anxiety Disorder, *id.*; Unspecified Depressive Disorder, *id.;* Cannabis Use Disorder, *id.* at 12; Unspecified Trauma- and Stressor-Related Disorder, *id.*; Sexual Identity issues for which he was referred for treatment at the University of Minnesota Sexual Identity Clinic, *id.*; and Oppositional Defiant Disorder, *id.* at 12; He was prescribed various medications including Prozac (for depression), *id.* at 6; methylphenidate (for AD/HD), *id.* at 10; Citalopram (for anxiety, irritability, and reactivity), *id.*; Vyvanse (for AD/HD), *id.* at 12.

In 2018, when Jasper was 13, he received in-patient treatment at the Prairie Care Partial Hospitalization Program. *Id.* at 11. His treating psychiatrist described him as "an immature and vulnerable adolescent . . . who could be easily manipulated, exploited or coerced."  *Id.* Prairie Care further noted that Jasper "may not foresee the consequences of his behavior nor is [sic.] he necessarily appreciate the impact of his behavior upon others." *Id.*

4.      Offense Conduct

Promethazine is an antihistamine often prescribed for symptomatic relief of nausea, allergic conditions, motion sickness, and the common cold. It is also used to treat insomnia in adults and as a pediatric sedative. Promethazine with codeine is prescribed for the "temporary relief of coughs and upper respiratory symptoms associated with allergy or the common cold." Package Insert (available at https://dailymed.nlm.nih.gov/dailymed/fda/fdaDrugXsl.cfm?setid=e41b8b94-be20-4706-9454-e98c46731ab1).

Even though codeine is classified as a controlled substance under Schedule II, because promethazine with codeine contains only a small amount of codeine as part of a medicinal formulation, promethazine with codeine is considered a Schedule V controlled substance.

Promethazine with codeine is a popular recreational drug in the rap and hip-hop communities. Known colloquially as drank, purple drank, or lean, the syrup is often mixed with juices or sodas to mask the bitter taste of the cough syrup. When used in quantities above prescribed amounts, the cough syrup can create feelings of euphoria or a calming sedative effect. The popularity of the syrup grew when it was celebrated in the lyrics of hip-hop songs, particularly in the underground music scene around Houston, Texas. The Fifth Circuit has described the cough syrup and its popularity as a recreational drug as follows:

> "Promethazine and promethazine-codeine cough syrup are prescription drugs approved by the FDA for distribution within the United States." But they "can have tranquilizing and euphoric effects when consumed

at higher-than-recommended doses, especially when mixed with alcohol or drugs such as marihuana." As a result, "[s]ome popular music has glamorized drinking promethazine-codeine cough syrup for its mind-altering effects, and promethazine-codeine has become increasingly popular among recreational drug users in Southeast Texas and elsewhere. Promethazine-codeine cough syrup mixed with a soft drink is sometimes referred to as 'syrup,' 'drank,' or 'lean.'"

United States v. Runsdorf, No. 22-40073, 2022 WL 1198205, at *1 n.2 (5th Cir. Apr. 22, 2022).

When Jasper first began his work as a rap artist as a young teen, he tried desperately to integrate himself into that world and be accepted by the older, established artists whom he idolized. His efforts were stymied by his acute anxiety, social inadequacies, and low self-esteem. Ex. A at 27. The people in the business dismissed Jasper as the "stupid White boy." Ex. A at 4.

Jasper quickly noticed that "drank" or "lean" were glorified in this community, and he became interested in how people procured it. At age 15, this became his new fixation, much like skateboarding and cup stacking had been in the past. "Like other restricted interests typical of his symptoms of autism, he became hyperfocused on the details of the project and did not consider the bigger possible consequences." *Id.* at 28. The very people by whom he wanted to be accepted were always looking for drank. *Id.* at 27. Devising schemes to obtain the syrup became a challenge and a puzzle for Jasper, and when he succeeded, the people around him were excited. It was "the first time I felt accepted," Jasper said. *Id.* The cough syrup opened doors for Jasper and helped him advance his music career. Jasper thought the people he was supplying were his friends, but given his tendency to

8

"misinterpret social situations," he was oblivious to the fact that "others were taking advantage of him." *Id.*

The indictment charges a series of offenses from January to June 2023 when Jasper was 17 and 18 years old, but Jasper's attempts to procure the cough syrup for his older colleagues began even earlier.

## DISCUSSION

**I.     This Court Should Reject a Guideline Enhancement for More than Ten Victims**

In the plea agreement, the parties did not limit themselves to the allegations in the indictment. Rather, Jasper admitted that the relevant conduct included not only the doctors alleged in the indictment whose RICS accounts were accessed, but several others as well. The plea agreement includes a total of nine doctors from Minnesota, Wisconsin, Florida, Georgia, and California. And because the plea agreement resolves offense conduct in those districts, the Central District of California, the Northern District of Georgia, the Middle District of Florida, and the Southern District of Florida have all agreed to be bound by the terms of this plea agreement. Doc. No. x at 2.

Nonetheless, the Probation Office has taken the position that there is a tenth victim, a doctor in Arizona, whose RICS account was accessed by unknown individuals. PSR ¶ 26. Based on that alleged tenth victim, the Probation Office assessed a two-level enhancement under USSG §2B1.1(b)(2)(A)(i). PSR ¶ 42. Both the government and Jasper objected to this enhancement. The government

9

acknowledged that it "does not believe there is sufficient evidence to conclude the Arizona physician was a victim of the defendants' criminal activity and therefore relevant conduct." Doc. No. 85 at 1. Jasper similarly objected to this guideline enhancement. Doc. No. 87.

The parties' agreement as to the number of victims was made in good faith. Given the dispute as to the relevant facts in the plea agreement, there is no basis in the record to upset that agreement. The Court, therefore, should reject the conclusion that there were more than ten victims and find that the applicable guideline range is 18 to 24 months on Counts 1 and 15, with a two-year mandatory minimum consecutive sentence on Count 16.

## II.   A Downward Variance to Time Served Is Appropriate on Counts 1 and 15.

If this Court had complete discretion, the defense would be arguing for a probationary sentence. Jasper is 21 years old with no criminal record. He committed this offense before he was old enough to buy a beer. And the offense conduct in large part is a product of Jasper's desire to be accepted in the rap community, a community where he has achieved significant success. As someone on the autism spectrum, Jasper became fixated on how to obtain the cough syrup, giving short shrift to the consequences of his actions. As Doctor Osborn observed, "It is common for people with autism to hyperfocus on the details of a situation and to hone in on how something works, rather than to consider the bigger picture of potential negative consequences." Ex. A at 27. A prison sentence will only create further

10

obstacles for Jasper in his struggles to overcome his mental illness.

Unfortunately, the Court does not have that option. Jasper, alone among the three defendants, faces a mandatory two-year sentence consecutive to any sentence imposed by the Court for Counts 1 and 15. The question then is what is the appropriate sentence for those counts separate and apart from the aggravated identity theft that is the basis for the mandatory minimum.

For the reasons discussed below, a downward variance to a sentence of time served is the appropriate disposition for those counts.

1.    Jasper's Youth, Autism and Other Mental Health Concerns Are a Mitigating Circumstance

As noted above, this offense is in large part a product of Jasper's youth and mental illness. Jasper began his career as a rap artist when he was only 15. In retrospect, his music career created a perfect storm which triggered all of his vulnerabilities. He was plagued with anxiety and self-doubt, yet he was desperate to be accepted. Despite his best efforts and commercial success, for the people whose approval he most wanted, he was nothing but the "stupid White boy." Ex. A at 4. As Dr. Osborn observed, Jasper's "high anxiety, social inadequacies, low self-confidence, and [low] self-esteem were barriers" to gaining entrée. *Id.* at 27.

That all changed when Jasper figured out how to game the system to obtain the cough syrup illegally. Suddenly, Jasper was celebrated by the people whose opinions mattered most to him. Unable to read the social cues, he believed he was finally accepted, and these people were his friends, never recognizing that they were

exploiting him for their own purposes. In reality, Jasper was once again "misinterpreting social situations and being unaware of the possibility that others were taking advantage of him." *Id.*

Learning how to game the system became one more obsession—something to perfect, like learning a skateboarding trick or a Michael Jackson dance routine. Dr. Osborn observes, "Like other restricted interests typical of his symptoms of autism, he became hyperfocused on the details of the project and did not consider the bigger possible consequences." *Id.* at 28. This focus also distracted Jasper from the anxiety he felt trying to succeed in the music industry at such a young age. "While he was focusing on the project, he gained acceptance from the community that was important to him and was able to pursue a consuming activity that provided a retreat from the anxiety and social discomfort that were so prominent in his everyday life." *Id.*

Thus, much like when he was sexually abused as a child, Jasper was so desperate to please the people whose opinions he valued that he was willing to compromise his own values. As Dr. Osborn notes, Jasper's psychological assessment did not reveal antisocial features of his personality. *Id.* at 27. Jasper was not motivated by money or thrill-seeking behavior. Rather, he simply wanted to please others and be accepted in the community in which he was engaged. Jasper will be better served by a probationary sentence that will allow him to address his needs for mental health treatment than a lengthy prison sentence.

Looking back, Jasper's mother, Nicole Ward, recognizes the dynamic that led

to Jasper's offense conduct. She writes that music helped Jasper gain confidence, but it was a double-edged sword: "But it also opened him up to bad influences, people with bad intentions. Being so young and white, it was hard to get accepted into that scene. He went through a lot of ridicule and bullying to get to where he is in the music scene today. . . . He was so desperate to fit in in that world that he made the mistakes that led to these charges."

2. Given Jasper's Vulnerabilities, He Is Likely to be Exploited in Prison

Jasper's diagnoses are not only relevant to help explain what motivated him to commit this offense. They are also relevant to how he is likely to experience prison. The very same characteristics that have made Jasper a target for exploitation throughout his life are also likely to make a prison sentence particularly difficult for him. Jasper is someone who can be manipulated because he so desires to please others and be liked. A prison environment in which Jasper finds himself surrounded by master manipulators is the last place he should be.

In addition, Jasper does not read social cues. In an environment where the rules are often unwritten and the consequences of violating them can be dire, Jasper will not understand how he is supposed to act or who he should trust. New inmates don't change the TV channel. White inmates don't sit at this table. Inmates don't chat with the guards. Jasper is a black-and-white thinker and will not understand those unwritten rules.

Dr. Osborn addressed these concerns in her report, noting that Jasper's "biological, psychological, social, and emotional" characteristics will increase the

13

risk for "detrimental consequences on his development and mental health" from long-term incarceration. *Id.* at 28. People with Autism Spectrum Disorder, which is characterized by persistent difficulties with social understanding are particularly "vulnerable to face challenges in correctional settings." For that reason, people on the spectrum "will serve a significantly harsher sentence than similarly situated neurotypical offenders." *Id.* (citation omitted). People on the spectrum fail to understand that two sets of rules exist—the written rules and the unspoken rules of prison culture. For those reasons, people like Jasper, "in correctional settings are more likely to be victims of crimes by others, due to their social misunderstandings (including not understanding others' motives), being easily influenced by others, and their naivete about the larger consequences of their behavior." *Id.* at 29.

These issues are further accentuated by Jasper's young age and the fact that throughout his life, he has depended on his mother to meet his needs and dispel his anxiety. Jasper's mother voices the same concerns when she writes about the imminent prison sentence: "But I don't want to see him break more. . . . It scares me to think about Jasper being taken advantage of even more by other inmates." His grandmother shares her worries: "I truly do believe that actions have consequences. But I have a genuine, gut wrenching fear that federal prison will destroy him and that he won't survive that experience; that it will either kill him or permanently further damage him."

All of these considerations would support a probationary sentence. Given that that is not a possibility, this Court should impose a sentence of time served for the

14

two counts on which this Court may still exercise its discretion.

      3.      The Gravamen of the Offense Supports a Time-Served Sentence

Although the indictment charges a number of different offenses in 23 counts, the gravamen of the charges is that Jasper obtained promethazine with codeine, a Schedule V cough syrup, by fraud. In Count 1, the indictment alleges that the defendants conspired "to acquire and obtain promethazine with codeine, a controlled substance, by misrepresentation, fraud, forgery, deception, and subterfuge." Doc. No. 1 at ¶ 3. Granted, to do that the defendants accessed the RICs computer system. But they accessed the system in order to obtain cough syrup by fraud.

Under U.S.S.G. § 2D2.2, the base offense level for acquiring a controlled substance by fraud is 8. There are no specific offense characteristics or chapter 3 adjustments. PSR ¶¶ 34-39. After credit for zero-point offender and acceptance of responsibility, this results in an adjusted offense level of 4 and a sentencing range of 0-6 months.

Or consider if Jasper had been charged with possession with intent to distribute a Schedule V controlled substance (promethazine with codeine). Under § 2D1.1, the base offense level for 160,000 dosage units or more of a Schedule V substance is 8. Again, after adjustments for zero-point offender and acceptance of responsibility, Jasper would face a guideline range of 0-6 months.

The government permitted Jasper's two co-conspirators to plead guilty to the Count 1 conspiracy alone. Mr. Varner faces a guideline range of 0-6 months. Mr. Becerra-Ruiz may face a guideline range of 2-8 months only because he is in

criminal history category III. The government, in arguing for a probationary sentence for Mr. Varner, described the Count 1 conspiracy as "among the least serious federal felonies." Doc. No. 95 at 3.

In all likelihood, of the three co-conspirators, only Jasper—this 21-year-old first offender who suffers from Autism Spectrum Disorder and only wanted to please others and be accepted in a social environment he was ill-equipped to understand—will go to prison for this offense.

4.    This Case Has Been Hanging Over Jasper for Three Years

The DEA executed a search warrant at Jasper's home in August 2023, when he was 18 years old. This case has been hanging over his head ever since, a period of nearly three years. That means Jasper has been living with the anxiety of not knowing how this case would be resolved for his entire adult life.

That long delay has been particularly difficult for Jasper because he suffers from an anxiety disorder. The anxiety and stress of uncertainty has only exacerbated the day-to-day struggles that he already faces. During that time, Jasper has not only faced the anxiety of an uncertain future. He has had an opportunity to reflect on the mistakes he made that have brought him to this point in his life, facing an imminent prison sentence that will disrupt all of the progress he has worked so hard to achieve.

The punishment of extended uncertainty has repeatedly been recognized as a basis for sentencing mitigation in this district. The judges on this bench have accepted the commonsense notion that delay between the offense and sentencing is a

salient circumstance that can itself warrant lesser punishment. The reasoning behind this notion is straightforward: waiting month after month causes and amplifies anxiety and stress and is itself a type of punishment. *See, e.g., United States v. Althea Jackson,* Crim. No. 14-06 (PJS) (D. Minn.). In that case, Ms. Jackson waited 26 months for the government to indict her, and another nine for her sentencing. The Court found that this delay caused her to "suffer[] a considerable amount of anxiety and stress," contributing to the Court's decision to vary downward to a sentence of probation. The Court found similar considerations to be mitigating and supportive of a variance in *United States v. Pierson, Crim.* No. 14-69 (D. Minn.(PJS) and *United States v. Turnquist, Crim.* No. 14-91 (JRT) (D. Minn.) (variance to probation).

Following the search of his home, Jasper was not indicted until November 26, 2024, 15 months later. By then, the original lawyer he had retained—Joe Friedberg—had died, and Jasper had to find new counsel. Now, another 18 months have passed from the date of the indictment to sentencing. This 33 month delay is nearly identical to the delay that warranted a downward variance to probation in *Jackson.*

Had the prosecution followed promptly after the search of his home, Jasper would likely already have completed whatever sentence this Court imposed and been able to get on with his life.

5.      Jasper's Youth Is a Basis for a Downward Variance

Jasper began the offense conduct when he was 15 years old. It ended when he

17

was 18. Even today, at 21, the prefrontal cortex of Jasper's brain is not fully developed. At his young age, "significant brain growth and development are underway." Ex. A at 29. The prefrontal cortex is responsible for impulse control and reasoning, yet it is not fully functional until the late 20s. Until it is fully developed, young adults like Jasper are biologically unable to engage in sound decision-making and to weigh the long-term consequences of their actions. *Id.* As a result, immaturity often results in "impetuous and ill-considered actions and decisions." *Roper v. Simmons*, 543 U.S. 551, 569 (2005) (citation omitted).

For those reasons, the courts recognize that a defendant's youth is a valid sentencing consideration. *See, e.g., Gall v. United States*, 552 U.S. 38, 58 (2007) ("Immaturity at the time of the offense conduct is not an inconsequential consideration."). As the Supreme Court has observed, "The susceptibility of juveniles to immature and irresponsible behavior means 'their irresponsible conduct is not as morally reprehensible as that of an adult.'" *Roper*, 543 U.S. at 570. *See United States v. Dean*, 626 F. App'x 586, 588 (6th Cir. 2015) (affirming 24-month downward variance because defendant was only 21 when he committed child pornography offense).

Jasper is not the same person who committed this offense when he was 18. Not surprisingly, in the three long years since then, he has matured substantially. For over a year, he has complied with his conditions of pretrial release. He has continued his successful music career. He is engaged to be married. Nadia Furmanski, Jasper's fiancée, has seen positive character development in Jasper

18

over the course of their relationship. She writes:

> Over time, I've seen so much character development from him. He's seeing a brighter future for himself whether that be supporting a family, a wife, going to school, and overall getting on the right track. . . . I have also had the blessing of watching him, in real time, go from one extreme to the other. A kid, with no idea what he wanted in life, into a man who yearns for stability, simplicity, a good job, education, and eventually a family of his own.

Harrison Jenkins, one of Jasper's managers, has watched Jasper learn how to navigate the adult world of the music industry. He describes Jasper's development as follows:

> I am aware that Jasper has dealt with mental health issues since he was a child, and I have seen him put in the hard work necessary to build a healthier and more stable life. . . . Over the course of our professional relationship, I have witnessed considerable personal growth. Jasper has developed into a dedicated, mission-driven professional who is focused on stability and building a legitimate, lasting career. He has accepted full responsibility for his actions and has made sincere efforts toward a healthier and more grounded way of life. The music industry has a clear and waiting place for him.

Finally, Sam Ward, Jasper's step-father captures who Jasper is as a person today when he writes:

> Jasper is a true overcomer. He is resilient and he is driven. It is not just his music career that is a testament to this, but I have watched a boy who desperately wanted to find where he fit in, become a man with purpose and limitless opportunity. He is beyond intelligent and his heart is full of love. I respect him for who he has become and I truly, truly love him dearly.

19

CONCLUSION

Jasper Johnson is a 21-year-old first offender. While trying to gain acceptance in the rap music world, he devised a clever scheme to obtain cough syrup by fraud. Jasper has fully accepted responsibility for his offense conduct, and this case has been a learning exercise for him. There are many factors that cry out for a probationary sentence. Unfortunately, the government has robbed the Court of discretion to impose that sentence. Nonetheless, the Court can still recognize the strong mitigating circumstances in this case by imposing a sentence of time served on counts 1 and 15, consecutive to the mandatory two-year sentence required on Count 16.

Dated: May 8, 2025

Respectfully submitted,

*s/ Robert D. Richman*
ROBERT D. RICHMAN
Attorney ID No. 226142
Law Offices of Robert D. Richman, LLC
P.O. Box 16643
St. Louis Park, MN 55416
(651) 278-4987

Attorney for Jasper Johnson

20